OPINION OF THE COURT
Martin B. Stecher, J.
Plaintiffs move for partial summary judgment against each of two insurance company syndicates. The principal dispute among the parties concerns the priority of insurance coverage provided by the respective policies. One defendant cross-moves for summary judgment dismissing the complaint as to it.
Plaintiffs (collectively designated hereafter as IBM) began the action against both insurance syndicates for the balance of a business interruption loss sustained after physical damage to IBM’s manufacturing plant in West Germany in May of 1977. Two policies of insurance covered the loss, one issued by a syndicate of American insurers, Granite State Insurance Company et al. (hereinafter re *682 ferred to as the American insurers), and the other issued by a Lloyds syndicate (hereinafter referred to as Lloyds).
Both insurance groups were notified of the loss and at a meeting in November, 1977, their adjusters agreed to the amount of the loss. At that time, the American insurers admitted that IBM’s loss was covered by its policy, but claimed that the loss was also covered by the Lloyds’ policy and, therefore, each syndicate was responsible for half the loss. Lloyds denied coverage.
Some three weeks after the meeting, the brokers for the American insurers advised IBM that they were prepared to advance 50% of the net loss provided that Lloyds paid the other 50% without prejudice to a resolution of the respective rights of the two insurance groups at a later time. Nothing transpired thereafter for approximately six months, at which time the American insurers apparently learned that Lloyds would not agree to any proposal for advancing any funds to IBM. Whereupon, the American insurers sent their checks for 50% of the net loss to IBM’s agent with a covering letter dated August 1, 1978, which reads as follows: “Since you have advised us that Lloyd’s and other insurers have refused to advance 50% as suggested in our letter of December 7, 1977, we herewith enclose checks of our principals totalling 50% of the agreed net loss of $1,851,000, which they consider to be the limit of their liability in view of the existence of coverage under the British policies.”
IBM acknowledged receipt of the checks by letter dated August 4, 1978 from its insurance manager to the brokers of the American insurers, which reads as follows:
“This will acknowledge receipt of the following checks in partial payment of our claims against the below named insurers in connection with the above captioned loss:
“As you know we have consistently taken the position that these insurers are liable for the entire loss and it is our intent to reserve our right to continue to press our claim against the insurers for the balance thereof notwithstanding Mr. Robinson’s letter to you of August 1, 1978.”
Within a week after sending the letter of August 4, the insurance manager of IBM orally asked the American *683 insurers for the basis for their conclusion that their liability was limited to 50% of the agreed loss. A written reply, dated August 11, 1978, was transmitted to IBM, which outlined the grounds for the position of the American insurers that they and Lloyds were each liable for 50% of IBM’s loss. IBM deposited the checks in one of their bank accounts on August 15, 1978.
IBM thereafter commenced this action to recover the balance of 50% of the agreed loss from both insurance groups, and for the loss alleged from the decline of the dollar against the German currency. IBM’s motion for partial summary judgment against both groups is limited to the 50% balance of the agreed loss, and while seeking a declaration of which of the two insurance groups is responsible for the balance, IBM contends that the American insurers are primarily responsible for that loss.
The American insurers contend that they have paid the limit of their liability and that they are not liable for any additional amounts because (1) there has been an accord and satisfaction with IBM, and (2) they are not liable in any event for more than 50% which has been paid, because the Lloyds is liable for the other 50% of the loss.
The “accord and satisfaction” claim is based upon the circumstances of the receipt and deposit of the checks by IBM for 50% of the agreed loss. IBM argues that it expressly refused to receive the money as payment in full, that it was their “understanding” that the tender of the checks was unconditional and that the deposit of the checks was not an acquiescence to a condition creating an accord and satisfaction with the domestic insurers.
The undisputed evidence does not establish an accord and satisfaction. An accord and satisfaction is an agreement, express or implied, between the parties, which must have all the essential elements of a valid contract: mutual assent and sufficient consideration (Fuller v Kemp, 138 NY 231, 236). Here, the demand by IBM of the American insurers was for a liquidated sum, the agreed amount of the loss. The payment by the American insurers of a sum less than the full amount of the liquidated demand and their refusal to pay the balance was a mere dispute be *684 tween the two insurance groups and nothing more than a partial payment, which does not furnish consideration to constitute an accord and satisfaction (Schuttinger v Woodruff, 259 NY 212). More significantly, the letter sent with the checks did not impose as a condition that the checks must be accepted as payment in full or rejected if IBM questioned the payment as in full of the American insurers’ obligation. There could not be imputed to IBM, on these facts, an assent to a compromise and abatement of the liquidated sum (see Hudson v Yonkers Fruit Co., 258 NY 168).
Accordingly, the affirmative defense of accord and satisfaction of the American insurers is stricken and the cross motion for dismissal of the complaint as to the American insurers is denied.
IBM’s motion for a partial summary judgment presents the always persistent efforts of insurance companies to shift liability to each other where more than one policy insures the risk. The American insurers’ policy contains the following language: “other insurance. This policy shall not cover to the extent of any other insurance whether prior to or subsequent hereto in date, and by whomsoever effected, directly or indirectly covering the same property against the same perils and this company shall be liable for loss or damage only for the excess value beyond the amount due from such other insurance.”
Section II of the Lloyds’ policy dealing with “Business Interruption and Extra Expense”, provides as follows: “8. property excluded. This policy does not cover Business Interruption loss or damage as a result of physical damage to: a) Property otherwise insured against for the perils herein provided except that this policy will respond as excess coverage affording recovery in an amount equal to the difference between the adjusted loss and the amount collectible from other insurance. The recovery under this excess provision shall be subject to this policy deductible except no deductible is applicable to Business Interruption and Extra Expense Coverage.” (Precisely the same language is contained in section I of the policy, “Property Insurance”, at paragraph 3a.)
*685 Additionally, section III of the Lloyds’ policy, under the heading “General Conditions”, states: “9. other insurance. If there is any other insurance covering the property insured hereunder which, in the absence of this insurance would cover a loss or damage hereby covered, then the Assurers shall not be liable hereunder for more than the excess over and above the amount collectible from such other insurance.”
The Lloyds’ policy expressly provides that “any question of interpretation of the terms and conditions of this policy shall be in accordance with the law and insurance practice of the State of New York.” The only language in the American policy referring to the law under which it shall be interpreted is: “The insurers agree that any action or proceeding against them for the recovery of any claim under this insurance shall not be barred if commenced within the time prescribed therefor in the statutes of the State of New York.” Under the circumstances under which this policy was issued, the requirements that modification be given through a New York agent and the foregoing quoted language, I conclude that the issues before me are to be determined under New York law.
The Lloyds’ policy, which has a limit of $5 million of coverage and a deductible of $500,000, is a “Difference in Conditions” (DIG) policy. The American policy in the sum of $30 million with a $500,000 deductible is a “named perils” policy in which the specific perils are spelled out including water damage and business interruption loss resulting therefrom.
The American insurers admit liability for the business interruption loss resulting from the water damage. They contend, however, that the DIG policy is primary insurance which covers 50% of the loss. (How they ascertain that 50% is the appropriate fraction is unclear.) They ascribe primary coverage to the DIG policy because it is an “all risks” policy covering the same property as is covered by the American insurers. Lloyds takes the position that a DIG policy is intended to cover gaps in primary policies and that IBM’s loss, therefore, is covered by the DIG policy only as excess insurance over the American policy.
*686 Most of the recent cases dealing with coverage conflict involve automobile insurance. The factual situations are, of course, circumstantially different than the situation here, for in those cases, the conflicting insurance companies have usually issued their policies to different assureds, such as the driver and owner of a car involved in an accident. Here, of course, both policies were procured by a single assured. Nonetheless, the principles enunciated in the automobile policies are applicable to the case at bar.
The leading case, involving conflicting excess coverage clauses, is Federal Ins. Co. v Atlantic Nat. Ins. Co. (25 NY2d 71) in which the principle was clearly established that where two policies covering the same risk each provides that it is excess to all other policies, the excess clauses cancel each other out and each policy is required to bear the risk pro rata to the amount of coverage. The theory is a matter of simple logic: For a policy to be excess there must be a primary policy; if both policies are excess, then neither is primary; if neither is primary, the insured becomes uninsured, a result which is manifestly absurd.
A somewhat different situation was presented in the case of Davis v De Frank (33 AD2d 236, affd 27 NY2d 924). There again there was a conflict between the insurer of the driver and the insurer of the owner. The owner’s policy covered (27 NY2d, at p 239) “any other person, but only if no other valid and collectible automobile liability insurance, either primary or excess, with limits of liability at least equal to the minimum specified by the state financial responsibility law — is available to such person.” It is the policy of the courts (Federal Ins. Co. v Atlantic Nat. Ins. Co., supra, p 77; Davis v De Frank, supra) to “give effect to the parties’ private law as reflected in their binding contractual arrangement.” In Davis (supra), the owner’s insurance agreement extended its coverage to the driver only on condition that he had no other automobile liability insurance. Lloyds would have us interpret the DIG policy in such fashion. All of Lloyds’ exclusion paragraphs, set forth in full above, are excess insurance clauses. One is specific to a business interruption loss. Another is specific to property insurance. The last of the quoted clauses, under *687 the provision called “General Conditions” is merely a catchall excess clause.
The proliferation of excess clauses does not result in an exclusion clause.
It is clearly the insurers’ intention, discernable from each of these policies, that its policy is primary insurance with an effort to be excess over other insurance. Under such circumstances, each of the excess clauses cancels the other out and each is primary insurance (Federal Ins. Co. v Atlantic Nat. Ins. Co., supra).
The Lloyds’ claim that in insurance practice, the DIG policy is intended only to fill the gaps in other policies is not supported by the language of the contract; for the language of insurance contracts, like any other contract, determines the obligations of the parties. If a policy were intended to be only excess to another or to cover only areas of coverage not provided by another company, it is presumed that the careful draftsmen of the policies would so indicate. (See Lumbermens Mut. Cas. Co. v Allstate Ins. Co., 51 NY2d 651.) That is not the case here.
The only issue remaining, therefore, is the obligation of each of the parties to IBM. The amount of the loss, well within the limits of both policies, has been adjusted among them. The American insurer has paid out 50% of the total obligation. Its proper share of the loss is 30/35ths by reason of the proportion of coverage which each policy has to total coverage.
The issue involving loss by virtue of currency fluctuations is not before me and in the judgment to be settled that issue will be severed and continued.
Accordingly, judgment may be entered in favor of the plaintiff against the defendants consistent with the foregoing.